ises? The statute under which Loeb & Brother claim their lien declares that "no execution must be levied on goods or chattels in possession of, and upon the premises of a tenant, held by lease for one or more years until the rent due, or to fall due during the current year, is paid or tendered to the landlord; * * * and the sheriff executing the writ must levy and sell as well for the repayment of the rent so tendered as for the satisfaction of the execution." Rev. Code Ala. § 2878. Clay's Digest of Laws of Alabama (page 506, § 3) contains a similar provision applicable to crops. It declares that "the crop grown on any rented land in this state shall not be taken by virtue of any execution, or removed off the premises of any such rented land, unless the party so taking the same shall, before removal of the crop from such premises, pay or tender to the landlord or lessee thereof all money due for the rent of said premises at the time of taking such crop in execution; provided such rent or arrears do not amount to more than one year's rent; * * * and the sheriff, or officer levying the same, is hereby empowered and required to levy and pay to the plaintiff, as well the money so paid for rent as the execution money." This last cited law has been construed by the supreme court of Alabama. In Frazier v. Thomas, 6 Ala. 169, it was held that this law did not give the landlord a lien upon the crop raised on rented land; it merely declared that, as between the landlord and an execution creditor, the former should be entitled to preference to the extent of one year's unpaid rent. See, also, Whidden v. Toulmin, 6 Ala. 104. I am unable to distinguish any material difference between the two statutes cited. If the latter does not give a lien, neither does the former. The ruling of the supreme court of Alabama, just cited, is followed in North v. Eslava, 12 Ala. 240, and Denham v. Harris, 13 Ala. 465. However much these rulings may be opposed by high authority, they are a construction of a law of this state which this court feels bound to follow. As there was no execution levied in this case, I am of opinion that Loeb & Brother did not acquire any lien for rent on the goods of the bankrupt found on the demised premises. On all grounds, therefore, their claim to priority of payment, out of the proceeds of said goods, should be disallowed. The result is, that the district court fell into error in recognizing the claim and lien of Loeb & Brother for $600. The order of the district court complained of is therefore annulled, and the claim and lien of Loeb & Brother disallowed.

[NOTE. For the operation of state laws under the bankrupt act, see Marshall v. Knox, 16 Wall. (83 U. S.) 551; Austin v. O'Reilly, Case No. 665; Wylie v. Smith, Id. 18,110; In re Joslyn, Id. 7,550; In re McGrath, Id. 8,808.]

BAILEY, (MEYER v.)    See Case No. 9,516.

## Case No. 740.

### BAILEY v. MILNER.

[1 Abb. (U. S.) 261;¹ 35 Ga. 330; 7 Amer. Law Reg. (N. S.) 371; 1 N. B. R. 419, (Quarto, 107;) 1 Amer. Law T. Rep. Bankr. 15; 2 Amer. Law Rep. 570.]

District Court, N. D. Georgia.    Feb. 18, 1868.

PAYMENT—CONFEDERATE NOTES—THEIR INVALIDITY.

1. The securities known as "Confederate Treasury Notes," issued by the self-styled Confederate States, during the Civil War of 1861-65, although not "bills of credit," issued by a state, and as such prohibited by the constitution of the United States, (article 1, § 10, subd. 1,) were, nevertheless, illegal; because they were issued by a pretended government, organized in the name of certain states, by subjects of the United States, who were at the time in rebellion against the rightful government of the United States, with design to dismember and destroy it.

2. A promissory note given in consideration of such bills is void, and does not constitute a debt provable in bankruptcy.

[Followed in Scudder v. Thomas, Case No. 12,567.]

[3. Where a person during the Rebellion accepted Confederate notes in exchange for his property, the transaction having been fully executed and free from fraud, covin, misrepresentation, or undue influence, the federal courts will leave the parties where they placed themselves.]

[Cited in Cuyler v. Ferrill, Case No. 3,523.]

Question upon the certificate of a register in bankruptcy.

ERSKINE, District Judge. In 1863, John Neal loaned twenty-five hundred dollars in "Confederate Treasury Notes," to Milner, the bankrupt, for which amount he made his promissory note to Neal. Subsequently Neal, in making a disposition of some of his property among his children and grandchildren, gave this note to his son-in-law, Samuel Bailey, in trust for minor children of Susan Beall, a daughter of Neal.

Bailey, as trustee, sought to prove this claim against the estate of the bankrupt. Counsel for the latter objected: First, because the consideration for the contract was Confederate treasury notes; secondly, because these notes were borrowed for the purpose of hiring a substitute to serve in the Confederate army, with the knowledge of Neal; and that the notes were so appropriated, and the substitute hired therewith did go into the said army.

Evidence being heard on these points, the register rejected the claim, and the proceedings were certified to the judge. The conclusion at which the register arrived was approved.

The party whose claim was thus rejected petitioned the judge for a re-hearing, on the ground that the testimony adduced—in proof of the second objection, in particular—was wholly insufficient to warrant the decision

¹ [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

of the register, or affirmance by the court. A new hearing was granted before the register. The testimony on both sides is long and contradictory, with the exception that all agree that the loan was made in Confederate treasury notes.

The register adhered to the course of reasoning previously entertained by him, and gave the same judgment as before. Mr. Bailey being still dissatisfied with the ruling, the matter was again certified for review.

From the views which I entertain of the legal principles involved in this proceeding, it is not essential to an approval or disapproval of the conclusion at which the register arrived, that these Confederate treasury notes, or any portion of them, were used to procure a substitute to serve in the Confederate army, or that they were employed for any other purpose. The register holds, as he held at first, that the contract was illegal and void; and this result I approve and affirm. But I do not concur with him in one of the principal reasons advanced for his decision; and which reason is more prominently argued in his first written opinion than in his last, namely, that these notes are bills of credit within the sense of that term, as understood in the constitution.

"No state shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit," etc. Const. [U. S.] art. 1, § 10, subd. 1.

No disquisition on the origin of bills of credit, or history of their rise and progress, or of their fall, under the inhibition just cited, would aid in the determination of this case. Therefore, I will but remark that the great minds that framed the constitution were, from recent experience, aware of the blighting effect on the domestic and foreign commerce of the states, and on the welfare of the whole country, which flowed from the almost indiscriminate issuing of these bills by the colonies, and afterwards by the states, as money, among the people, to suffer its perpetuation, or to longer tolerate it to the states; and time has proven the wisdom of their statesmanship.

So far as I have been able to ascertain, all paper answering to bills of credit put forth during the war of independence were promises to pay. But be this so or not, the supreme court of the United States, in Craig v. Missouri, 4 Pet. [29 U. S.] 410, held that a paper currency emitted by a state, and receivable in discharge of all debts and taxes due the state, and of all salaries and fees of office, &c. &c.—and pledging the faith and funds of the state for the redemption of these paper issues—was within the constitutional prohibition.

The same court, in Briscoe v. Bank of the Commonwealth of Kentucky, 11 Pet. [36 U. S.] 258, gave the following comprehensive definition of a bill of credit: "The definition, then, which does include all classes of bills of credit emitted by the colonies or states, is a paper issued by the sovereign power, containing a pledge of its faith, and designed to circulate as money."

Taking this definition, as imparted by the highest judicial tribunal in the land, as a guide, it will conduct to a correct conclusion of the endeavor to ascertain whether these treasury notes, or bills, issued by the so-called Confederate States, fall within it.

Although it is declared that no state shall emit bills of credit, yet if two or more of the states ally themselves, or confederate together, and on their faith and credit issue these bills, I apprehend the inhibition would apply with a force equally as direct and controlling against the allied or confederate states as against a single one.

Here is a copy of one of these treasury notes: "Fundable in eight per cent. stock or bonds of the Confederate States. Six months after a ratification of a treaty of peace between the Confederate States and the United States, the Confederate States of America will pay five dollars to bearer. Richmond, September 2, 1861. Receivable in payment of all dues except export duties."

Then follow the names of a register and treasurer. One decision—and only one—on this subject has been brought to my notice; that is the case of Bank of Tennessee v. Union Bank of Louisiana, [Case No. 899,] lately tried before Judge Durell and a jury, in the circuit court of the United States for the eastern district of Louisiana.

The judge is there reported to have said, in his charge to the jury, "That Confederate treasury notes issued by said government, and circulated as money, were bills of credit within the meaning of the constitution, and therefore an unlawful issue." The views which present themselves to my mind do not terminate in accord with the opinion expressed by the learned judge.

During the latter part of the year 1860, and in the early part of 1861, South Carolina, Georgia, Louisiana, Virginia, and other states, by similar modes, called on the people to send delegates to meet in convention. Accordingly, these conventions assembled, and each passed an ordinance of secession, as it is generally termed, by which ceremony these conventions severally adventured to withdraw the states from the Federal Union, and to release the people from their subjection to the laws of the land, and their allegiance to the nation. The constitutional state governments were overthrown, and superseded by spurious and revolutionary governments. The setting up of a pretended central or general government, styled "The Confederate States of America," followed; and, soon thereafter, open rebellion and war of portentous magnitude burst upon the nation. Prize Cases, 2 Black, [67 U. S.] 635; Shortridge v. Macon, United States circuit court, district of North Carolina, opinion of the

court delivered by Chief Justice Chase, [Case No. 12,812.]

In the seceded states (so-called) the sovereign authority being, for the time, displaced, consequently there ceased to be, within any of them, a government under the constitution of the United States. Then, can it be said that the usurping power could pledge the faith of the state by a public law, or otherwise, for the payment of the notes or bills issued by the so-called Confederate States of America? Or could this pretended central government bind any of those states for the redemption of these notes?

But these Confederate treasury notes or bills do not pretend to have been emitted by a state, or a combination of states of the Union; nor can it be inferred from indicia found upon them—nor can their recondite history show—that they emanated from the sovereign power, and on the faith of any of the states. And thus it will be seen, that they did not possess the characteristic attributes of bills of credit, in accordance with the definition of the supreme court of the United States;—they did not issue by virtue of the sovereignty of the state, nor did they rest for their currency on the faith of the state pledged by a public law. Darrington v. State Bank of Alabama, 13 How. [54 U. S.] 12.

Notwithstanding these notes or bills were not, in my judgment, bills of credit within the prohibition contained in section 10 of article 1 of the constitution, yet they were none the less illegal; they were issued by a pretended government, organized in the name of certain states, by subjects and citizens of the United States, and who, at the very time, were in rebellion against their rightful government, and whose design and object it was to "dismember and destroy it." Prize Cases; Shortridge v. Macon, supra.

It may not be wholly unimportant to remark that it is a well established doctrine of the courts that a wide distinction exists between an executed and an executory contract. In the former case courts of justice will not, as a general rule, interfere between the parties, to set the contract aside, but will leave them where they placed themselves; and this, too, notwithstanding the contract be in part only founded on an illegal consideration.

Nevertheless, any person owning property may, if no fraud be put upon him, and no misrepresentation, or circumvention, or covin enter into the transaction, alienate it conditionally or absolutely, for what currency or thing he chooses, or even give it away.

But an executory contract, like this claim of Bailey, the trustee, [against the bankrupt Milner,][2] nevertheless, will not be enforced. The principles of law directly applicable to executory contracts, based upon illegality, were long since determined by the courts, both in England and in this country. One

---

[2] [From 1 N. B. R. 419.]

case only will be referred to. The doctrine on this subject, as laid down by Mr. Justice Washington, in Toler v. Armstrong, [Case No. 14,078,] is so succinctly announced that it is best it be given in his own words: "I understand the rule, as now already settled, to be, that where the contract grows immediately out of, and is connected with an illegal or immoral act, a court of justice will not lend its aid to enforce it. And if the contract be in part only connected with the illegal transaction, and growing immediately out of it, though it be in fact a new contract, it is equally tainted by it."

If this demand of twenty-five hundred dollars were allowed, the dividends of the creditors, arising from the assets would, of course, be diminished that amount—and this without any fault on their part, but wholly through the illegal dealings of the bankrupt and Neal. Bankruptcy Law, § 22; [Act March 2, 1867, § 22; 14 Stat. 537.]

I may add that the law, in allowing a guilty party to take advantage of the illegality of his own act—as is here done by the bankrupt—does so, not with a view of conferring a benefit on him, but upon grounds of public policy; and also, in this case, that injustice may not be done to the creditors of the bankrupt.

The decision of the register is approved. The clerk will certify this opinion to Mr. Register Murray.

NOTE, [from original report.] This case and Cuyler v. Ferrill, [Case No. 3,523,] should be read in connection with the later decision of the supreme court in Thorington v. Smith, 8 Wall. [75 U. S.] 1. It is there held, in an action to recover the agreed price in a contract of sale of property made in the usual course of business, and which price was, by the actual intent and understanding of the parties, payable in Confederate notes, that a contract made between persons residing in the so-called Confederate States, during the Rebellion, and expressed to be payable in Confederate notes, but having no other tendency or purpose to aid the Rebellion than the mere fact of its treating Confederate paper as the currency in which it should be discharged, may be enforced by action in the courts of the United States. Although the government of the Confederate States was not a de facto government in the highest sense known to the law, it was for the time being a government of paramount force. It acquired an actual supremacy, which indeed is not a legal defense for acts of hostility performed under it towards the United States, but which rendered submission to its authority in civil and local matters, not only a necessity but a duty. The notes issued by its authority must be regarded as a currency imposed on the community by an irresistible force. They must be regarded in our courts in the same light as if they had been issued by a foreign government temporarily occupying a part of the territory of the United States. Contracts stipulating for payment in such currency cannot be regarded, merely for that reason, as made in aid of the insurrection. They are free from blame except proved to have been made with actual intent to promote the insurrection. And they should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation. [See Thorington v. Smith, 8 Wall. (75 U. S.) 1; Delmas v. Merchants' Mut. Ins. Co., 14

Wall. (81 U. S.) 661; Planters' Bank v. Union Bank, 16 Wall. (83 U. S.) 483; Taylor v. Thomas, 22 Wall. (89 U. S.) 479; Holleman v. Dewey, Case No. 6,607; Hatch v. Burroughs, Id. 6,203; Evans v. City of Richmond, Id. 4,570.]

## Case No. 741.

### BAILEY v. NICHOLS et al.

[2 N. B. R. 478, (Quarto, 151;) 2 Amer. Law T. Rep. Bankr. 60; 1 Chi. Leg. News. 185.]

District Court, N. D. Ohio. April, 1869.

BANKRUPTCY—PROOF OF NOTES PLEDGED AS COLLATERAL.

[Promissory notes for $1,100, which were invalid in the hands of the payee, were pledged by him to secure an indebtedness of $147.35. *Held*, that on the bankruptcy of the maker the pledgee was entitled, under the bankrupt act of March 2, 1867, (14 Stat. 517, c. 176,) to prove against the bankrupt estate the full amount of the notes, and to receive dividends thereon to the extent of $147.35, and that the proof should not be restricted to the sum of $147.35. the amount of the debt secured by the pledge of the notes.]

[In bankruptcy. Petition by Bailey, assignee of Warner & Curtis, bankrupts, against T. W. Nichols, payee of promissory notes made by the bankrupts, and Hower & Co., indorsees. Prayer that the notes be canceled, except as to the interest of Hower & Co. Granted. Prayer that Hower & Co. be allowed to prove and receive dividends on only the amount of the notes. Denied.]

SHERMAN, District Judge. In March, 1868, Warner & Curtis purchased of T. W. Nichols a patent right, which was afterwards discovered to be of no value, and gave, among other things, their two promissory notes, one for five hundred dollars, due in eight months. and one for six hundred dollars, due in twelve months. In May, 1868, Nichols purchased goods of Hower & Co., to the amount of one hundred and forty-seven dollars and thirty-five cents, and gave them the above-named notes as collateral security for the payment of his indebtedness. It is admitted that the notes are valid in the hands of Hower & Co., but as to Nichols, they are void, the patent for which they were given being worthless, and he, in fact, subsequently agreeing to cancel them. Warner & Curtis were declared bankrupts, June 1, 1868, and Bailey appointed their assignee June 16, 1868. The petition prays: First, that Nichols may be decreed to surrender the two notes and they be cancelled, except so far as the interest of Hower & Co. is concerned; and second, that Hower & Co. may only prove said notes to the amount of one hundred and forty-seven dollars and thirty-five cents, and receive dividends on that sum. The first prayer is, of course, granted, as it carries into effect the agreement made between Nichols and Warner & Curtis.

The second involves this question. Can Hower & Co. prove against the estate of Warner & Curtis such an amount on the two notes that the dividends thereof will be sufficient to pay the full amount of one hundred and forty-seven dollars and thirty-five cents, or is it only allowable to prove to the extent of one hundred and forty-seven dollars and thirty-five cents, and receive dividends on that amount. When negotiable paper is deposited as collateral security, as this was, it is a pawn or pledge vesting a special property in the pawnee, with a right to detain it as security for the debt, and leaving the general property in the pawnor. Garlick v. James, 12 Johns. 146. When the pledge is negotiable paper, the pledgee cannot compromise with parties to the paper for less than the whole sum due on the paper, and if he does, he will be compelled to account to the pledgor for the full value. 15 Mass. 534; 12 Ind. He has a right to sue the paper and recover the full amount in his own name. Indeed, it has been held, that in the absence of a special power, he has no right to sell, but he may apply to a court of equity for a foreclosure and sale, and the purchaser in that case could certainly prove and receive dividends on the whole amount of the security. The pledge, in all cases, is a security for the whole and every part of the debt. The payment of a part still leaves the whole security a perfect pledge for the residue of the debt. Story, Bailm. § 301.

These principles show very clearly that Hower & Co. can hold the two notes until their debt is paid; that they have no right to compromise without the assent of Nichols; that they may sue and recover on the notes in their own name, and that the whole of both notes are as much security for the last, as the first dollar of their claim. This being so, it follows that they have the right to prove both notes against the estate of the bankrupts, or as much of the same as will secure dividends to the amount of one hundred and forty-seven dollars and thirty-five cents, their claim. This doctrine was expressly ruled by Lord Thurlow in Re Crossley, 3 Brown, Ch. 237; and by Lord Eldon in 6 Ves. 449, 600. And also in 1 P. Wms. 582. I am therefore compelled by these authorities to order, first, that Nichols surrender the two notes and that they be cancelled, except as to the interest of Hower & Co. in them; second, that Hower and Co. are entitled to receive, and that they be paid dividends on the amount of said two notes to the extent of one hundred and forty-seven dollars and thirty-five cents, and no more.

## Case No. 742.

### BAILEY et al. v. PACIFIC R. CO. et al.

Circuit Court, E. D. Missouri. March 28, 1874.

[Nowhere reported; no opinion rendered. Reversed by the supreme court, on appeal, in Bailey v. Magwire, 22 Wall. (89 U. S.) 215.]